I'm Amitai Schwartz. I'm the attorney for Jonathan Buckheight, the appellant in the appeal of the First Amendment claim and also the appeal of the $145,000 in attorney's fees that were awarded to the County of San Mateo. I'd like to reserve five minutes, if I may, for rebuttal. I think the key to the whether this case was frivolous is, number one, was it frivolous in the sense that it was obvious at the outset? And second, is this an exceptional case? This Court's case law and the law of the Supreme Court, Christiansburg Garment and Hughes v. Roe, this Court's cases in Harris, Brownstein, Keram, etc., all look at the obviousness of whether there was a foundation for the case at its inception or whether it became frivolous somewhere down the line. Let me ask you this, Mr. Schwartz. I have nothing but sympathy for what happened to Dr. Buckheight. My problem is I can't see that any of that was the fault of San Mateo County. Well, that's where the magistrate or the district judge focused. He said, well, why is the county in this case? The county shouldn't have been in here. Let me explain why, if I may. The Mr. Buckeight got caught in this unfortunate circumstance with the ex-girlfriend and was arrested, and then he was falsely charged with injuring the child and so forth. And he needed to extricate himself from that. And first off, the county district attorney did not file, did not prosecute him, but under California law, he had a remedy, which was this factual innocence petition. And under California law, the factual innocence petition has an administrative exhaustion problem, requirement, which is that Mr. Buckeight had to petition the police department for a finding of factual innocence, and he had to serve that on the county district attorney. So at that point, the county district attorney became a player in this. The county district attorney, under 851.8, the California factual innocence statute, plays a big role in it. He has to concur in the finding of factual innocence if there is going to be one. If there is going to be a hearing before a California superior court judge, as there was, he's the one who defends it. It was the county district attorney. So when Buckeight, through his previous attorney and through himself, asked for copies of the police report from the county district attorney so that and to the town of Atherton so that he could pursue this factual innocence proceeding with some precision, it would have been and everybody admits, it's in the depositions and we briefed it, that it would have been very difficult to pursue a factual innocence petition without the report. Okay. They say they don't have the report. Excuse me? They say they don't have the report. You asked the wrong people. Well, they say they didn't have the report. Well, they didn't show that they did. They said no, I mean, I don't. It's one thing if they have the report and they don't turn it over, then I get your gripe. But if they say we sent it back to the police department, go ask the police department, what do you want them to do? In fact, I understand they said we'll even make a call or two to see if we can help. Well, I have a couple answers to that. Number one is how is he supposed to know that at the outset? I mean, one is to sue. Why don't you sue the State of California? I mean, you know, if they don't have the report, they don't have the report. No, but when he files his lawsuit, his 1983 lawsuit, he doesn't know who has what. I think it's a rational assumption on a civilian's part, somebody who's never been arrested before, somebody who's a middle class guy, that the D.A. would have a copy of the report. He didn't tell him we can't give it to you because we don't have it? He told him at one point that he didn't have it. But did that make his 1983 suit frivolous from the outset? And secondly, he – and this is addressed in our reply brief. Mr. Wagstaff, the chief deputy district attorney, said he could have gotten the report back for Buckeye, and the records clerk at Atherton said if, on in-deposition, if Mr. Wagstaff had asked for the report, we would have, of course, with his words, sent it to Mr. Wagstaff. But Wagstaff said he lost the desire to get that report for Buckeye because the Atherton police chief opposed the factual innocence petition. So that's where it becomes intertwined between the county and the town of Atherton. You've got the two of them working together, or what I called in our brief, in our appellate briefing, a joint understanding. They're working together. The D.A. says I could have gotten the report back, would have been easy, but I lost the desire to do it because Atherton told me not to. So there's a question about that. Kennedy, did you have any prejudice that came from that, a delay in the factual finding, factual innocence finding, or what? What prejudice occurred? Because if you go by what we have in the record, a request was made by the county, that was turned down or opposed by the town. Ultimately, he did get his factual innocence determination. So there was a delay in that? There was a delay, and there was certainly a – Buckeye had no way of knowing that he was charged with this injury to this child and charged with, quote, strong arm until he finally got a copy of that report. That was a pretty heavy charge. But it's more than just injury to the child. That was somewhat weak in terms of that. But there was also the alleged injury to the girlfriend, which, again, I'm not going to go over those facts. They're all set forth in the record. It was more than just this alleged claim of injury to the child. It was also the girlfriend. But going back to the point of your conspiracy argument, which is what I think you're hinging upon, after all these facts were developed before the judge, didn't the district judge here give a warning that, look, this seems rather weak to me. You're facing some potential frivolous findings and sanctions. But yet it was still pursued after that warning. Yeah. And this Court has said in the Herb Kelman Chevrolet case from I think it's 1995 or 1999 that a warning like that does not necessarily make it frivolous. In the in-bank decision in Jensen v. Stengel, the Court said similar. So just because the Court – and what the Court said was that it's weak. And the Court said, you know, you may be playing with fire. But that doesn't necessarily, just because a district court, you know, doesn't like a claim, doesn't necessarily convert it into an exceptional case, an obvious case. Let me make two other points about the county, because I think this is key to it. The other issue is that this – on this gender discrimination claim, you had this issue about the county. And in the court's report, the county's attorney, Mr. Buck, I thought was the county policy that you don't make dual arrests in domestic disputes. There was a county policy that says this is the county protocol. We pointed out in the briefs. It says down at the body, bottom, County of San Mateo, Protocol for Domestic Disputes. Atherton's using the exact same protocol, word for word. The arresting officer says, in deposition, the county district attorney would not have accepted a dual arrest. They arrest Buckhite because he's bigger. He's also a man. And he turns that into a gender discrimination claim. And he names the county because it's this county protocol. So it's hard. It was a creative claim. He put in evidence. The district court allowed it to survive motions, two motions to dismiss. Took it to summary judgment. And at that point, Mr. Buckhite lost. But every, the, another case I want to, which goes to this county issue is this Parks Business School case, which I cited in the opening brief. And that was a case where the Parks Business School was a small technical school that was receiving education grants. Something called the Arizona Education Fund, Loan Fund or something, cut them off and said, we're not going to make loans to students at that school anymore. The school sued the Education Fund, and they also sued the governor of Arizona, who was Fife Symington at the time. And the, this Court, the Ninth Circuit, said that, yes, the district court was not correct, that there was no valid claim, and that the Parks Business School was cut off from its education loans. But they also said, this Court said, the case was not frivolous, even though the governor of Arizona, Mr. Symington, asked for fees. And the reason they said it wasn't frivolous is because they said there was a, quote, tenuous connection to the state of Arizona. When, in fact, there was no, no direct connection between the state of Arizona and this funding entity, which was a private corporation incorporated in Delaware. So I just want to point out that where there's a tenuous connection, and whether this Court thinks that there's a tenuous connection to the county, I hope I made that point, that, you know, that's good enough to survive. Thank you, Mr. Schwartz. Good morning. My name is Brian Wong. I represent the county in this matter. As the Court has mentioned already, the county's concern throughout this case has been that there was never any connection between the county and the underlying arrest that led to all of the events alleged in the complaint. The policy that was being followed by the Atherton officers who were employed by Atherton and following a policy adopted by Atherton and promulgated by Atherton, there was no connection between the county and that arrest. To the extent that the policy has the words County of San Mateo on them doesn't prove anything, especially if you read the text of the policy that indicates that the originating agency was actually a police chiefs and sheriffs association. The evidence, all the evidence in the case has indicated that Atherton had full discretion to adopt that policy and that the policy was a joint effort by law enforcement. Why does counsel, why does the policy have the county of San Mateo name on it? I believe that it's for geographical significance. For example, there are a number of agencies within the county of San Mateo that use the term County of San Mateo to describe it. For example, Sam Tran, San Mateo County Transit Authority. There's business associations that also include the term County of San Mateo in it. That was an issue that I briefed in front of the trial court. For example, the Chamber of Commerce of County of San Mateo. So there's both the political entity that is the county that can act and contract and affect other people, but there's also the geographical borders of the county that is often used to describe the scope of an agreement or sort of the regional reach of a particular organization. Who actually put out that document? It was put out by the Sheriff's Association. So if you look at the preliminary comments, that indicates that there is a county wide association that works together to ensure a uniform law enforcement response on a variety of different policies. I believe that Steve Wagstaff in his deposition testified that domestic violence is one of these areas, but there's a number of them including sexual assaults, homicide, etc. The idea being that all of the police chiefs, the sheriff, and the DA collaborate to come up with sort of a best practices guide for all of the agencies within the county to review and adopt if they believe that that's a policy they believe is appropriate. Typically they do adopt them, but it's always left to the discretion of each of the individual law enforcement agencies to adopt the policy. And when they adopt it, they don't necessarily have to adopt it whole cloth. They can decide if they want to adopt portions of it or otherwise. What's your answer to Mr. Schwartz's point that, it's not exactly his words, but it was at least a reasonable mistake in thinking that the county could have produced the police report if it had wanted to? Well, I think that there's sort of two issues related to that. One is that it was clear even before this litigation began that the county didn't have the report and that Atherton did. And so when the county directed him to Atherton, that was a clear direction as to how we should proceed in pursuing the report. With respect to whether it was reasonable to assume that the county could have provided it, I think that the county's actions subsequent to the request sort of demonstrate what the county was able to do. They went and they, Steve Wackstaff went and he asked the police chief whether there was some way he could facilitate the production of this police report to Mr. Buckeye. And the response he got back from the chief was, no, I'm not going to do that. I can't speak to Atherton's motivations for that, but as the briefing from below indicates, Atherton was interpreting the Public Records Act in a way that they believed prohibited them from providing the report to Mr. Buckeye. In the absence of the county actually possessing the report, they did the most they could do. And to the extent that Atherton refused to provide a copy to either directly to Mr. Buckeye or to the county in order to provide it to Mr. Buckeye, the county wasn't in a position any different than Mr. Buckeye to demand it at that point in time. Kennedy. Counsel, could I please interject a question here? Yes.  That the county is along for the ride with the town of Atherton on some tenuous connection theory because of its policy. Assuming that's the case, what's the law on disparate impact, that is, on a policy that acts more harshly on men than on women, because men are heavier than women? What's the law on that, as to whether it's justified? I'm sorry, Your Honor. I didn't mean to interrupt. What's the law as to whether such a policy is justified? So as the trial court discussed extensively in its order on summary judgment, it's not possible to prove a discriminatory policy simply by alleging disparate impact. That's the Washington v. Davis case. It's a long established line of Supreme Court cases indicating that even if there's a disparate impact, there needs to be a second element when the policy itself is facially neutral. In this case, if you were to read this domestic violence policy end to end, there's no mention of gender. There's no mention of how men should be treated differently. There are certainly elements in there that might have a disparate impact in the way that they're employed, but it's facially neutral, and therefore, there needs to be an additional showing of discriminatory intent. In this case, there's never been any factual showing that either Atherton or the county had any sort of a discriminatory intent when they, if they were to, if the county were to be involved, that the county had a discriminatory intent in drafting it that way and promulgating it to the town of Atherton, assuming they even had the ability to do that. So is it a frivolous contention to argue that disparate impact without evidence of discriminatory intent can support a claim? That is the county's position. The case law is very clear that it requires both of those elements. And to the extent that the appellant has only described the impact, there's extensive evidence that was submitted below from experts and such regarding disparate impact, there still was never any showing of intent. And it was clear that that was an element that needed to be proved below in front of the trial court, and in the absence of any evidence of that intent, it makes the claim frivolous from the outset. Mr. Wong, I want to make sure I understand. We see a lot of sex discrimination claims. Let's say where women say they've got a different job, but they should be paid more because their job is comparable to some job men have that pay more, and that's a disparate impact. And if we reject that, is it frivolous to reward attorney fees? I think if the facts indicate that this was a single isolated incident unsupported by case law, then it would be frivolous. On the other hand, if the evidence shows that this is a recurring and pervasive practice, then that would suggest it's not frivolous. It would indicate that there was, in fact, some sort of intent. Although not explicitly stated, there is some allowance in the case law indicating that if the disparate impact is so obvious as to suggest or provide circumstantial evidence of a discriminatory intent, then it's possible to find that the claim is legitimate. I want to make sure I understand. I'm sorry, Judge Gould, did I interrupt you? No, I was just saying thank you. I just want to make sure I understand, and I'm going to ask Mr. Schwartz to comment on this. You're representing to us that the document that he's complaining about, this so-called policy, was not promulgated by San Mateo County, but was promulgated by a sheriff's association. Is that right? That's right. So the way it works is that the DA does work closely with this association to come up with the policy. So the county is not denying that it had a part in creating the policy. It has a part in creating lots of different policies that are generated for consideration and then adoption by the various law enforcement agencies within the county. So in this case, the association serves as the umbrella organization for pulling all of these law enforcement agencies together. If you look at the document itself, it lists off all of the various heads of law enforcement agencies, including the California Highway Patrol, police chief, sheriff, and the DA. They all come together and collaborate to create the agreement, then they all signed it to indicate that they had worked together to create it. But then once it's finalized, as Chief Nielsen testified in his deposition, it was Adderton's decision to then take that policy and then adopt it into their own regulations that apply to their officers. Let me change the facts. Suppose the policy said when police are called to a domestic dispute, always arrest the man. Suppose that's what it said. Given the county's hand in this, whatever it was, facilitating it, signing it, whatever, would it have been frivolous to sue the county under those circumstances? I still think it would be frivolous under the rule set forth in the Arnold case, which is identified very early in this case. In order for there to be 1983 liability by a third party, not the actual arresting agency, but by a third party, there needs to be sufficient control over the arresting officers by the entity alleged to have caused that 1983 injury. So in this case, if the policy, in fact, had a bald assertion that there should be gender discrimination whenever there's an arrest in connection with a domestic violence incident, there still wouldn't be sufficient control of the county, control by the county over Atherton in deciding to adopt what would be a sort of a facially unconstitutional policy. Would that be at least sufficiently tenuous to preclude a frivolous finding? I think it could be. I think that if it was so obviously discriminatory, then there could be an argument made that there might be sufficient connection. But, of course, that isn't the case here, where the plaintiff alleged agreements for the county to promulgate a policy that Atherton would then employ or issue training that Atherton would then employ, which would result in discriminatory policy, discriminatory arrests. Okay. Mr. Miller, Judge Gould, or Mr. Wong, do you have anything else? No questions here. I've got nothing. Thank you. Mr. Schwartz, back to you. Thank you, Your Honor. The ‑‑ I want to make another point that I didn't have time on, which was the last point on the ‑‑ whether the county had the report, and that is, as we showed, the county child protective services had that report all along. They are part of the county. We briefed that. Even though Mr. Wagstaff said the chief deputy DA said he was sending the report away, he threw it away, he sent it back, whatever, it was in the custody of the county of San Mateo all along. And that was presented to the district court, and the district court did not find that determinative, but the fact of the matter is it was there. So how could it be frivolous if the report was, in fact, in the custody of the county? The ‑‑ Mr. ‑‑ Whom was the request made? Was it of the district attorney? Was it of the county? How was that request fashioned exactly? How was it fashioned? It was ‑‑ well, it was through ‑‑ Mr. Buck, I believe he asked the receptionist at the DA's office for it, and then his attorney, his former attorney, Mr. Carey, asked, I think in the form of a phone call, I'm not positive it was a phone call, for a copy of the report, and then it was discussed further, and then it comes out in the deposition later on that Wagstaff lost the desire to pursue the report because the Atherton police chief told him he opposed the factual innocence. What I was getting at is it sounds like the request was made for the district attorney, if you have the report, give it to us. It doesn't sound ‑‑ it sounds like the way the request was made, it was of the district attorney, of whatever the district attorney had, rather than asking it to search every county agency and from the way you were describing it. Yeah. I mean, he didn't make, you know, our typical Freedom of Information Act request or Public Records Act request. It was ‑‑ but also, it wasn't a passing request, you know, in a restaurant or something. It was a formal request. Right. The ‑‑ I think one of the things that distinguishes this case in terms of whether it's frivolous or not is it's not like the Tudor Saliba case where this Court found a plaintiff's claim to be frivolous. That was a case where a guy wanted to land his airplane, his private jet, in Howley, Idaho, and claimed that the weight limits that they had at the airport somehow discriminated against him, and this Court found that that was a frivolous claim. That was a guy who claimed that, you know, he was entitled to something that he wasn't entitled to. Jonathan Buckeye was aggrieved. He found himself in this Kafkaesque nightmare where he was trying to clear his name, and he was trying to do exactly what Congress said he said ‑‑ what Congress encourages by using the Civil Rights Act to try to vindicate his rights. Now, you know, some of his claims were, let's say, creative. They were different. But there wasn't direct circuit precedent saying you're going to lose. There wasn't ‑‑ he didn't have a crystal ball that told him exactly what the relationship was between the county and the town of Atherton. He did what Congress tries to encourage. In this Court's Harris decision, Harris v. Maricopa County, the opinion of the Court says we discourage findings of ‑‑ that a case is frivolous, and we especially discourage them in civil rights cases. And what kind of a message does it send to hit a guy like Jonathan Buckeye with $145,000 in legal fees when he's not claiming some entitlement? He's just claiming that he's aggrieved, and he's trying to take advantage of what his Constitution and our Constitution guarantees him. But he lost. And we had a very spirited debate here about that. And the district court wrote 78 pages on this. And, you know, it's a messy case, but it's not frivolous.   Roberts.  Roberts.  Roberts. Roberts. Roberts. Roberts. Roberts. Roberts. Roberts. Roberts. Roberts.             Roberts. Roberts. Roberts. Roberts. Roberts. Roberts. Roberts. Roberts. Roberts. Roberts.
judges: Lemelle, Silverman, Gould